**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| LIONRA TECHNOLOGIES LTD., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:24-CV-00097-JRG |
| | § | |
| CISCO SYSTEMS, INC., | § | |
| | § | |
| *Defendant*. | § | |
| | § | |

**MEMORANDUM OPINION AND ORDER**

On April 16, 2025, the Court held a hearing to determine the proper construction of the disputed claim terms in U.S. Patent No. 7,738,471 (the "'471 Patent" or "Asserted Patent"). Having reviewed the arguments made by the parties at the hearing and in their claim construction briefing (Dkt. Nos. 35, 38, 41), having considered the intrinsic evidence, and having made subsidiary factual findings about the extrinsic evidence, the Court hereby issues this Claim Construction Memorandum and Order. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc); *see also Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331-32 (2015).

## I. BACKGROUND

Plaintiff Lionra Technologies Ltd. ("Lionra" or "Plaintiff") alleges that Defendant Cisco Systems, Inc. ("Cisco" or "Defendant") infringes the Asserted Patent. (Dkt. No. 1.) The '471 Patent, titled "High Speed Packet Processing in a Wireless Network," was filed on September 14, 2007, and issued on June 15, 2010. The '471 Patent relates "to a method and apparatus for high speed protocol header processing at an intermediate and/or destination node of a packet-based communications network." '471 Patent at 1:8-11.

The Abstract of the ’471 Patent states:

> A method is provided for processing a packet (300) at an egress end user node (110). The method includes a decoding step and a concurrent writing step. The concurrent writing step is performed subsequent to the decoding step. The decoding step involves decoding a packet having a plurality of headers (306-314). The concurrent writing step involves concurrently writing each of the headers (306-314) to a packet buffer memory (122) and a respective protocol stack layer memory (126-134). More specifically, a MAC layer protocol header (306) is concurrently written to the packet buffer memory and a MAC layer memory (126). An LLC layer protocol header (308) is concurrently written the packet buffer memory and an LLC layer memory (128). A network layer protocol header (310) is concurrently written to the packet buffer memory and a network layer memory (130), and so on.

Claim 1 of the ’471 Patent is an illustrative claim and recites the following elements (disputed term in italic):

> 1. A method for processing a packet at an egress end user node, comprising:
>
> decoding a packet having a plurality of headers; and
>
> subsequent to said decoding step, concurrently writing (1) each of said plurality of headers to a *packet buffer memory* and (2) each individual one of said plurality of headers to a respective protocol stack layer memory where it is available for immediate processing within a protocol stack layer.

## II. APPLICABLE LAW

### A. Claim Construction

“It is a ‘bedrock principle’ of patent law that ‘the claims of a patent define the invention to which the patentee is entitled the right to exclude.’” *Phillips*, 415 F.3d at 1312 (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *Id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc’ns Grp., Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. The general rule—subject to certain specific exceptions discussed *infra*—is that each claim term is construed according to its ordinary and

accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent. *Phillips*, 415 F.3d at 1312-13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) (cleaned up) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.") *cert. granted, judgment vacated*, 575 U.S. 959 (2015).

"The claim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "[I]n all aspects of claim construction, 'the name of the game is the claim.'" *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998)) *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015). First, a term's context in the asserted claim can be instructive. *Phillips*, 415 F.3d at 1314. Other asserted or unasserted claims can also aid in determining the claim's meaning, because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id*. at 1314-15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id*. (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms,

give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id.*

The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex*, 299 F.3d at 1325. But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The prosecution history is another tool to supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent. *Phillips*, 415 F.3d at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1318; *see also Athletic Alts., Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguous prosecution history may be "unhelpful as an interpretive resource").

Although extrinsic evidence can also be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are not helpful to a court. *Id.* Extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.* The Supreme Court has explained the role of extrinsic evidence in claim construction:

> In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period. *See, e.g., Seymour v. Osborne*, 11 Wall. 516, 546 (1871) (a patent may be "so interspersed with technical terms and terms of art that the testimony of scientific witnesses is indispensable to a correct understanding of its meaning"). In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the "evidentiary underpinnings" of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal.

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331-32 (2015).

**B. Departing from the Ordinary Meaning of a Claim Term**

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution."[1] *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d

[1] Some cases have characterized other principles of claim construction as "exceptions" to the general rule, such as the

1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)); *see also GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."). The standards for finding lexicography or disavowal are "exacting." *GE Lighting Sols.*, 750 F.3d at 1309.

To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *Id.* (quoting *Thorner*, 669 F.3d at 1365); *see also Renishaw*, 158 F.3d at 1249. The patentee's lexicography must appear "with reasonable clarity, deliberateness, and precision." *Renishaw*, 158 F.3d at 1249.

To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender. *Cordis Corp. v. Bos. Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009); *see also Thorner*, 669 F.3d at 1366 ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."). "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

## III. LEVEL OF ORDINARY SKILL IN THE ART

It is well established that patents are interpreted from the perspective of one of ordinary skill in the art ("POSITA"). *See Phillips*, 415 F.3d at 1313 ("[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent

---

statutory requirement that a means-plus-function term is construed to cover the corresponding structure disclosed in the specification. *See, e.g., CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002).

application.”). The Federal Circuit has advised that the “[f]actors that may be considered in determining the level of skill in the art include: (1) the educational level of the inventors; (2) the type of problems encountered in the art; (3) prior art solutions to those problems; (4) the rapidity with which innovations are made; (5) sophistication of the technology; and (6) education level of active workers in the field.” *Env’tl Designs, Ltd. v. Union Oil Co. of California*, 713 F.2d 693, 696 (Fed. Cir. 1983). “These factors are not exhaustive but are merely a guide to determining the level of ordinary skill in the art.” *Daiichi Sankyo Co. Ltd. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007).

Plaintiff’s expert, Dr. Hugh Smith, contends that a POSITA would have “either (1) a bachelor’s degree in computer science, computer engineering, or electrical engineering and at least two years of experience in computer networking, including packet-based networking such as the Internet Protocol, or (2) equivalent work experience in the design and/or implementation of systems involving computer networking. As reflected in the level of ordinary skill, a person of ordinary skill can have ‘equivalent education and work experience.’ Thus, more education could substitute for experience, and more experience (e.g., when combined with training), could substitute for formal college education of the person of ordinary skill in the art.” (Dkt. No. 35-5 ¶ 21.)

During the claim construction hearing, Defendant agreed with Dr. Smith’s proposed level of ordinary skill. Accordingly, the Court adopts Dr. Smith’s proposed levels of ordinary skill. Specifically, a POSITA would have (1) a bachelor’s degree in computer science, computer engineering, or electrical engineering and at least two years of experience in computer networking, including packet-based networking such as the Internet Protocol, or (2) equivalent work experience in the design and/or implementation of systems involving computer networking. A person of

ordinary skill can have equivalent education and work experience. Thus, more education could substitute for experience, and more experience (e.g., when combined with training), could substitute for formal college education of the person of ordinary skill in the art.

## IV. CONSTRUCTION OF AGREED TERMS

The Parties agreed to the construction of the following claim term:

| Claim Term/Phrase | Agreed Construction |
|---|---|
| "concurrently writing (1) each of said plurality of headers to a packet buffer memory and (2) each individual one of said plurality of headers to a respective protocol stack layer memory"<br><br>'471 Patent, Claims 1, 13 | Plain meaning, i.e., "concurrently writing (1) each of said plurality of headers to a packet buffer memory and (2) each individual one of said plurality of headers (each concurrently with each other) to a respective protocol stack layer memory." |

(Dkt. No. 45-1 at 2 (P.R. 4-5(d) Joint Claim Construction Chart).) In view of the Parties' agreement on the proper construction of the identified terms, the Court hereby **ADOPTS** the Parties' agreed construction.

## V. CONSTRUCTION OF DISPUTED TERMS

The Parties dispute the meaning and scope of one term in the Asserted Patent. The dispute is addressed below.

### A. "packet buffer memory"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "packet buffer memory" | No construction necessary. Plain and ordinary meaning.<br>.<br>Alternatively, "a memory for storing packets including both headers and payload" | "CPU main memory space used for the packet transfer" |

#### 1. Analysis

The term "packet buffer memory" appears in Asserted Claims 1 and 13 of the '471 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same

general meaning in each claim. The Parties dispute whether the term "packet buffer memory" requires construction. Specifically, the Parties dispute whether the specification "**defines** 'packet buffer memory' as the 'CPU main memory space used for the packet transfer,'" as Defendant contends. (Dkt. No. 38 at 16 (emphasis in original).)

Defendant argues that the specification provides a clear lexicography for the claim term "packet buffer memory." *Id.* Specifically, Defendant points to the following sentence: "The CPU main memory space used for the packet transfer is known as the packet buffer memory 122." (*Id.* (citing '471 Patent at 5:49-51).) According to Defendant, the phrase "known as" constitutes definitional language. (*Id.* (citing *EpicRealm, Licensing, LLC v. Autoflex Leasing, Inc*, 2006 WL 3099603, at *10 (E.D. Tex. Oct. 30, 2006); *GlaxoSmithKline LLC v. Anchen Pharms., Inc.*, 2012 WL 5594540, at *3 (D. Del. Nov. 15, 2012); *Dali Wireless, Inc. v. Corning Optical Commc'ns LLC*, 2021 WL 3037700, at *10 (N.D. Cal. July 19, 2021)).) Defendant further argues that the specification also makes clear that the defined "packet buffer memory 122" is the "packet buffer memory" of the claims. (Dkt. No. 38 at 17 (citing '471 Patent at Abstract, 5:64-6:1, 4:20-22, 4:28-29, 5:49-51, 5:64-6:1, Figures 1 and 4).)

Defendant also contends that nowhere is "packet buffer memory 122" included in a prior art embodiment. (Dkt. No. 38 at 18.) Defendant argues that its construction does not exclude the preferred embodiments. (*Id.* at 19.) According to Defendant, the preferred embodiments include "packet buffer memory 122," which the patent defines as "[t]he CPU main memory space used for the packet transfer." (*Id.* (citing '471 Patent at 5:49-51).) Defendant contends that it would make little sense to include an entirely separate depiction of a CPU in these embodiments when the embodiments already include a component which is the CPU main memory space. (*Id.*) Finally, Defendant also contends that Plaintiff's extrinsic evidence is irrelevant because the patentee's

lexicography governs. (*Id.* (citing *C.R. Bard, Inc. v. United States Surgical Corp.*, 388 F.3d 858, 863 (Fed. Cir. 2004)).) Defendant argues that Plaintiff's citations to expert testimony, a dictionary definition, and two unrelated patents are unpersuasive and irrelevant. (Dkt. No. 38 at 19.)

The Court finds that the patentee did not intend to limit the term "packet buffer memory," as Defendant contends. When construing claim terms, courts recognize lexicography if "the patentee clearly, deliberately, and precisely define[s] the [disputed] phrase." *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1379 (Fed. Cir. 2005); *see also Renishaw*, 158 F.3d at 1249 ("The patentee's lexicography must, of course, appear 'with reasonable clarity, deliberateness, and precision' before it can affect the claim.") (quoting *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994)). When considered in context, the single sentence cited by Defendant does not satisfy the standard for lexicography. Instead, the sentence describes a prior art embodiment. Specifically, the specification states that "[i]n *a conventional* EEUN [egress end user node]" where "a packet is transferred from a MAC layer memory to a CPU main memory through a serial or parallel memory transfer performed by a CPU… [and] [t]he CPU main memory space used for the packet transfer is known as the packet buffer memory 122." ('471 Patent at 5:47-51 (emphasis added).) This description at best describes one embodiment, and it is not even an embodiment that utilizes a direct memory access (DMA) device, an alleged point of novelty of the invention. The EEUN of the preferred embodiment shown in Figure 1 includes a "DMA engine 120," and the specification describes how the "general purpose of a DMA device is to allow peripheral devices to read or write data *without involving a CPU.*" ('471 Patent at 5:34-36 (emphasis added).) Thus, there is no indication that the sentence relied on by Defendant was intended to limit the scope of the invention to embodiments using a "CPU."

Indeed, the specification describes other prior art embodiments that do not mention a CPU

in the context of a "packet buffer memory." Specifically, the specification states that Figure 5 is "a schematic illustration of a conventional egress end user node (EEUN) configuration that is useful for understanding how the inventive arrangements differ from conventional EEUN configurations." ('471 Patent at 4:30-33.) The specification explains that Figure 5 has three distinct packet buffer memories, but does not mention a CPU related to these three packet buffer memories. (*Id.* at 11:17-35.) If the patentee had intended to limit the plain and ordinary meaning, there would have been some indication that it was disclaiming part of that ordinary meaning. This is especially true in light of the specification that expressly teaches the preferred embodiment using a "DMA engine" whose "general purpose" is to operate "*without involving a CPU.*" (*Id.* at 5:34-36 (emphasis added).)

Simply stated, the specification does not state that the invention is limited to packet based communications systems utilizing a "CPU." Nor does Defendant explain why the patentee would limit the invention to systems utilizing a "CPU." *See Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 967 (Fed. Cir. 2022) ("Embodiments in the specification—even if there is only one embodiment—cannot limit the scope of the claims absent the patentee's words or expressions of manifest exclusion or restriction.") (cleaned up). Accordingly, the intrinsic evidence confirms that the sentence quoted by Defendant does not satisfy the "exacting" standard for lexicography. *Id.* ("To act as its own lexicographer, a patentee must clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning and must clearly express an intent to redefine the term.") (cleaned up); *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014) ("The standards for finding lexicography and disavowal are exacting.").

During the hearing, Defendant argued that the Court in *Polaris* recognized that the plaintiff failed to explain why the understanding of "conventional" panels should not carry over to the

claimed display panel. *Polaris Powerled Techs., LLC v. Samsung Elecs. Am., Inc.*, No. 2:22-CV-00469-JRG, 2024 U.S. Dist. LEXIS 106029, at *20 (E.D. Tex. June 14, 2024). As an initial matter, it is inconsistent to argue that a term has a "conventional" meaning, while at the same time arguing that the patentee "clearly, deliberately, and precisely define[d] the [disputed] phrase" in an unconventional manner. *Id.* (quoting *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1379 (Fed. Cir. 2005).

Moreover, the alleged lexicography in *Polaris* was based on the preliminary response in the related IPR proceeding, where the patent owner further characterized the purported invention in addition to the specification's description. *Polaris*, 2024 U.S. Dist. LEXIS 106029, at *18. In contrast, the alleged lexicography in this case is a single sentence in the specification that describes "*a conventional* EEUN [egress end user node]" in an embodiment that does not even utilize the alleged point of novelty (*i.e.*, a direct memory access (DMA) device). ('471 Patent at 5:47-51 (emphasis added).) There is no indication, much less a clear, deliberate, and precise indication, that the patentee intended to limit the claims as Defendant contends. *Merck*, 395 F.3d at 1379 (stating that to invoke the court's lexicographer doctrine, the patentee must "clearly, deliberately, and precisely define[] the phrase."). Thus, Defendant's cite to *Polaris* is unpersuasive.

As discussed above, the purported lexicography is a description of one embodiment, and Defendant fails to provide a persuasive reason to limit the claims to this one embodiment. To be clear, the Court is not suggesting that a definition must be repeated multiple times to find lexicography. Instead, the Court finds that in this case the patentee did not act as its own lexicographer for the term "packet buffer memory."

In conclusion, Defendant ask the Court to improperly redraft the claims to introduce an unwarranted limitation into a "disputed" term. The Court is not at liberty to redraft the claims as

Defendant proposes. *K-2 Corp. v. Salomon SA*, 191 F.3d 1356, 1364 (Fed. Cir. 1999) ("Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee."). Accordingly, the Court finds that the phrase "packet buffer memory" is unambiguous, is easily understandable by a jury, and should be given its plain and ordinary meaning. *Aventis Pharm., Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013) ("There is a heavy presumption that claim terms are to be given their ordinary and customary meaning.").

### 2. Court's Construction

For the reasons set forth above, the term **"packet buffer memory"** does not require construction, and is given its **plain and ordinary meaning.**

## VI. CONCLUSION

The Court adopts the construction above for the disputed term of the Asserted Patent. Furthermore, the Parties should ensure that all testimony that relates to the term addressed in this Order is constrained by the Court's reasoning. However, in the presence of the jury the Parties should not expressly or implicitly refer to each other's claim construction positions and should not expressly refer to any portion of this Order that is not an actual construction adopted by the Court. The references to the claim construction process should be limited to informing the jury of the constructions adopted by the Court.

**So Ordered this**

**May 10, 2025**

RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE